IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JOSEPH A. DANIELS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:22-cv-760–HEH |
| ) | |
| VINCENT GORE, M.D., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**
(Granting Defendant's Motion for Summary Judgment)

Plaintiff Joseph A. Daniels ("Daniels"), a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action. The action is proceeding on Daniels' Complaint (ECF No. 1) in which he contends that Defendant Vincent Gore, M.D. ("Dr. Gore"), denied him adequate medical care during his incarceration in the Greensville Correctional Center ("GCC").[1] Although Daniels does not set forth clear claims, the Court construes the Complaint to raise the following claims for relief:[2]

> Claim One: Dr. Gore was deliberately indifferent to Daniels':
> (a) "serious and prolonged complications as a result of contracting the coronavirus" (*Id.* at 8); and,
> (b) "untreated severe degenerative disc disease." (*Id.*)
>
> Claim Two: Dr. Gore was negligent or grossly negligent in treating Daniels' medical conditions. (*Id.* at 10.)

---

[1] By Memorandum Opinion and Order entered on October 25, 2023, the Court dismissed Defendant Michael Gaither because Daniels failed to timely serve him. (ECF Nos. 34, 35.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

Daniels asks for monetary damages. (*Id.* at 11.)

The matter is before the Court on the Motion for Summary Judgment (ECF No. 42) filed by Dr. Gore. Daniels filed a response (ECF No. 49). For the reasons set forth below, Dr. Gore's Motion for Summary Judgment will be granted.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the responsibility of informing the court of the basis for the motion, and to identify parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former FED. R. CIV. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment.

*Anderson*, 477 U.S. at 251 (citing *Schuylkill & Dauphin Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448 (italics omitted)). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) ("The Federal Rules of Civil Procedure require parties to cite all evidence in support of their positions at summary judgment, thus permitting a district court to limit its review to such cited materials." (citing FED. R. CIV. P. 56(c)(1), (3))).

In support of his Motion for Summary Judgment, Dr. Gore submitted his own declaration (ECF No. 43-1) and copies of Daniels' medical records (ECF No. 43-2).

At this stage, the Court is tasked with assessing whether Daniels "has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *See Celotex Corp.*, 477 U.S. at 324. Although Daniels filed a response, it does not address the arguments made in Dr. Gore's Motion for

3

Summary Judgment.³ (ECF No. 49.) However, the Court notes that Daniels references that he filed an Affidavit with his own Motion for Summary Judgment. (*Id.* at 2 (citing ECF No. 31-4);⁴ *see also* ECF No. 25). Daniels' Motion for Summary Judgment was denied by Memorandum Order (ECF No. 41) entered on December 13, 2023, but the Court will consider Daniels' Affidavit in assessing the propriety of summary judgment.⁵

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of Daniels.

## II. UNDISPUTED FACTS

Daniels has been housed in GCC since August 25, 2010. (Daniels' Aff. ¶ 4, ECF No. 25.) Dr. Gore was the Medical Director at GCC during the time of Daniels' allegations in the Complaint. (Dr. Gore's Decl. ¶ 1, ECF No. 43-1.)⁶ Because Daniels often simultaneously complained about long-COVID symptoms and his neck-related

---

³ Daniels' submission is entitled, "Motion to Dismiss Vincent Gore, M.D.'s Reply Regarding Motion for Summary Judgment." (Resp. at 1.) Daniels then states that he "respectfully submits this response to the Defendant's Motion for Summary Judgment." (*Id.* at 1.) However, this response is devoted to arguing that the Motion for Summary Judgment should not be considered on procedural grounds. (*Id.* at 1–3.) The Court has rejected Daniels' arguments several times (*see* Mem. Order at 2, ECF No. 41; Mem. Order at 1–2, ECF No. 48), and these arguments will not be discussed again here.

⁴ Daniels cites ECF No. 31-3 when referencing his Affidavit. However, Daniels' Affidavit is filed as ECF No. 31-4.

⁵ The Court also notes that Daniels' Complaint was not sworn to under penalty of perjury.

⁶ The Court omits the secondary citations to the medical record in the citations to Dr. Gore's declaration.

4

pain, to avoid repetition, the Court recounts Daniels' medical history for these two (2) conditions generally in chronological order.

In August 2020, Daniels contracted COVID-19. (*Id.* ¶ 11.) The contemporaneous medical records show that Daniels' symptoms were not severe. (*Id.*) On August 17 and 27, 2021, Daniels' medical records show that he was seen in medical for complaints of a "knot on his neck" and a periodic sore throat, and that Nurse Practitioner Blowe ("NP Blowe") ordered lab studies, a throat culture, a chest x-ray, and a neck ultrasound. (*Id.* ¶¶ 27–28.) During the August 27, 2021 appointment, Daniels also complained of groin itch and medication was provided. (*Id.* ¶ 28.) On August 26, 2021, and again on September 16, 2021, Daniels had his blood drawn for the lab work. (*Id.*; Daniels' Med. R. at 4, ECF No. 43-2.) During the September 16, 2021 appointment, Daniels voiced no complaints. (Daniels' Med. R. at 4.) Dr. Gore authorized an x-ray on September 20, 2021, because of Daniels' history of prostate cancer and due to a new knot on the left side of Daniels' neck. (Dr. Gore's Decl. ¶ 15 & n.1.) Daniels had an ultrasound on September 28, 2021, and that test revealed a calcification in his neck. (*Id.* ¶ 30.) On October 1, 2021, a different GCC physician, Dr. Gaither, met with Daniels to discuss his lab work pertaining to his thyroid condition. (*Id.* ¶ 13.)

On October 15, 2021, NP Blowe saw Daniels to discuss the results of the chest x-ray. (*Id.* ¶ 12.) During this appointment Daniels reported symptoms that he believed were caused by his prior COVID-19 infection. (*Id.*) Despite Dr. Gore insisting that

5

Daniels first reported his loss of taste and smell at this appointment,[7] Daniels clearly had filed grievances addressed to "Medical" complaining about his loss of taste and smell beginning as early as August of 2020. (*See* Pl.'s Resp. to Dr. Gore's Waiver of Answer at 19–23, ECF No. 31-3.) In a grievance dated May 16, 2021, "S3 Medical" responded that "[w]hile this is a common side effect of COVID-19, [Daniels would] be scheduled for MD sick call." (*Id.* at 23.) Thus, the record demonstrates that the medical department was aware of Daniels' complaints about his loss of taste and smell nearly fourteen (14) months prior to October 15, 2021.

During the October 15, 2021 appointment, Daniels reported that he was experiencing shortness of breath with exertion, and a loss of taste and smell which he indicated had been present since he had COVID-19 in August 2020. (Dr. Gore's Decl. ¶ 12.) The October 15, 2021, appointment is the first time Daniels complained about shortness of breath with exertion. (*See id.*) After examining Daniels, NP Blowe noted that he had clear lungs and even, unlabored breathing. (*Id.* ¶ 15.) NP Blowe explained to

---

[7] Dr. Gore states:

> Further, there is no indication that he was experiencing any symptoms that *he believed had been caused by his prior COVID infection* until over a year later, when he was seen by [NP Blowe] on 10/15/2021 for another reason. At the time of that visit, Mr. Daniels reported shortness of breath with exertion and a loss of taste and smell. . . . However, there are many times prior to that date where he was seen by health care providers and Plaintiff reported no similar issues and/or no COVID related issues. . . . Plaintiff did not bring any COVID-related issues to anyone's attention prior to 10/15/2021.

(Dr. Gore's Decl. ¶¶ 12–13, 15 (paragraph numbers omitted) (citations omitted).) Although Daniels may not have complained about his loss of taste and smell during medical appointments, he certainly complained about these symptoms in grievances that were directed to and answered by the medical department.

6

Daniels that the chest x-ray showed "calcified granulomas in the bases of both lungs," but that there were no other abnormalities. (*Id.*)[8] NP Blowe prescribed medications to help Daniels with his breathing and scheduled a consult with a pulmonologist that was marked, "urgent," and was approved at the corporate level on October 20, 2021. (*Id.* ¶¶ 15–16)

Daniels was seen by a pulmonologist from Pulmonary Associates of Richmond on November 19, 2021, and that physician recommended that Daniels have a CT Angiogram to evaluate his shortness of breath and granulomas. (*Id.* ¶ 17.) That same day, Dr. Gore placed a referral request for the CT Angiogram and ordered various medications, and pulmonary function studies. (*Id.* ¶ 18.) Daniels saw Dr. Gaither on November 30, 2021, for a follow-up. (*Id.*) Dr. Gaither reviewed with Daniels the labs and studies that were going to be performed and noted that Daniels would be seen by the pulmonologist again six (6) weeks from November 19, 2021. (*Id.*)

Dr. Gore wrote a specific referral request for Daniels to be sent to John Randolph Medical Center on December 8, 2021, for the CT Angiogram for his shortness of breath. (*Id.* ¶ 19.) The CT Angiogram revealed sequela of prior granulomas disease and mild pneumonia in the left lower lobe of the lung, but no pulmonary embolism. (*Id.*) Dr. Gore wrote a referral for Daniels to be seen by the pulmonologist, Dr. Laura Vinson ("Dr.

---

[8] Daniels insists, without any citation to the medical record, that the x-ray "revealed infections [of] Daniels's lungs, spleen, liver, kidneys, and a partial collapsed lung." (Daniels' Aff. ¶ 9.) The results of the x-ray simply do not show all of these ailments. Nor does Daniels' medical records reflect any of these conditions. Daniels has offered no specific facts supporting this assertion. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (concluding that "[a]iry generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . ." (citation omitted) (internal quotations omitted)).

7

Vinson"), on December 15, 2021, and she made treatment recommendations. (*Id.* ¶ 20.) In accordance with Dr. Vinson's schedule for follow-up, Dr. Gore authorized Daniels to be seen by Dr. Vinson on February 15, 2022. (*Id.* ¶ 21; Daniels' Med. R. at 29.) At this appointment, Daniels reported a loss of taste and smell and "neck swelling," and Dr. Vinson referred Daniels to an otolaryngologist ("ENT"). (Dr. Gore's Decl. ¶¶ 21, 31; Daniels' Med. R. at 29.)

On March 10, 2022, Dr. Gore wrote a referral for Daniels to have a CT scan of his chest with contrast at John Randolph Medical Center. (Dr. Gore's Decl. ¶ 22.) The scan was reviewed by a radiologist who compared it with the earlier imaging and noted that it again showed granulomatous disease and chronic atelectasis/scarring in the left lower lobe "similar in appearance to prior examination." (*Id.*) On May 11, 2022, Dr. Gaither reviewed these findings with Daniels and noted that the lung issues were chronic. (*Id.* ¶ 23.) Daniels indicated that at this appointment he "was once again seeking attention for his loss of smell and taste, [and] was also told by Dr. Gaither that there was no [treatment] for loss of taste and smell." (Daniels' Aff. ¶ 12.)

Because of the calcifications found in Daniels' neck, Dr. Gore ordered an x-ray of Daniels' neck on March 22, 2022. (Dr. Gore's Decl. ¶ 36.) The x-ray revealed severe degenerative disc diseases at the C5–C6 level of his cervical spine. (*Id.*) Degenerative disc disease is a chronic condition that occurs as people age and is not a condition that anyone caused Daniels to develop. (*Id.* ¶ 42.)

Nurse Practitioner Blankenship ("NP Blankenship") received the radiologist report on April 1, 2022, and requested to see Daniels in the clinic to discuss the results. (*Id.*

8

¶ 37.) On April 11, 2022, NP Blankenship reviewed the results with Daniels, and she prescribed two (2) medications for his cervical spine pain, Flexeril and Celebrex, and initiated a referral to an orthopedic specialist. (*Id.* ¶ 38; Daniels' Med. R. at 8.) That same day, Dr. Gore authorized the referral to the orthopedic specialist. (Dr. Gore's Decl. ¶ 39.)

On August 24, 2022, Daniels was seen by an orthopedist, Dr. Henceroth. (*Id.* ¶ 40.) Dr. Henceroth determined no treatment was needed for Daniels' cervical spine at that time but recommended that Daniels follow up with the ENT. (*Id.*) Dr. Henceroth indicated that a follow up with an orthopedist was only to be as needed. (*Id.*)

On September 6, 2022, Dr. Gore saw Daniels in the Chronic Care Clinic, where patients with chronic illnesses are seen for routine follow-ups. (*Id.* ¶ 32.) The medical record shows that Daniels' chronic diseases were listed as having prostate cancer in 2021, hypertension, and COVID-19 in 2020 resulting in loss of taste and smell. (Daniels' Med. R. at 11.) During this appointment, Daniels reported that his pain from the degenerative disc disease in his neck was a two out of ten. (Dr. Gore's Decl. ¶ 41.) Dr. Gore conducted an in-depth assessment of Daniels' conditions and provided patient education which included a review of his medications. (*Id.* ¶ 32.) Daniels explained to Dr. Gore that "he had been seeking medical attention from Dr. Gaither and other medical staff since August of 2020 for complications resulting from contracting Coronavirus, including shortness of breath and loss of smell and taste." (Daniels' Aff. ¶ 8.)[9] Presumably at this

---

[9] Daniels also wanted Dr. Gore to review "a disk within his medical file revealing subsequent health complications since contracting COVID-19, but was told by Dr. Gore that GCC does not

9

same appointment, Dr. Gore "told Daniels that there was not a cure for loss of taste and smell." (*Id.* ¶ 11.) Dr. Gore noted that the ENT evaluation was pending. (Dr. Gore's Decl. ¶ 32.)

A note in Daniels' medical chart on April 23, 2023, indicates that the ENT appointment was rescheduled based on the provider's request. (*Id.* ¶ 24.) The appointment was rescheduled for July 12, 2023. (*Id.*) Dr. Gore authorized the appointment for that date with the ENT, but, on the day of the appointment, Daniels refused to go. (*Id.*; Daniels' Med. R. at 45.)

## III. ANALYSIS

### A. Deliberate Indifference Standard

To survive summary judgment on an Eighth Amendment claim, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

---

have the technology to review the disk's findings." (Daniels' Aff. ¶ 15.) Daniels does not identify where this disk was from and why it would contain different information than what the various specialists reported back to the medical staff at GCC.

10

easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105–06).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### B. Long COVID Symptoms

In Claim One (a), Daniels complains that Dr. Gore was deliberately indifferent to his "serious and prolonged complications as a result of contracting the [C]oronavirus in August [] 2020." (Compl. at 8.) It is undisputed that Daniels contracted the COVID-19 virus in August 2020. As a preliminary matter, the Court assumes that the loss of taste and smell due to COVID-19 and shortness of breath are sufficiently serious medical conditions to trigger the Eighth Amendment. However, the record establishes that Dr. Gore was not deliberately indifferent to Daniels' complaints.

Daniels specifically faults Dr. Gore for not addressing or correcting Daniels' loss of taste and smell, or "provid[ing] meaningful medical treatment," and "instead, [telling] Daniels that there was no[] cure for loss of taste and smell." (Daniels' Aff. ¶ 11.) Dr. Gore avers that there is no cure or treatment for COVID-related loss of taste and smell. Dr. Gore and other medical providers at GCC explained this to Daniels, but Daniels has

12

refused to accept this fact. Notably, Daniels does not suggest that any of the specialists he saw were able to cure or treat his loss of taste and smell. Therefore, Daniels seeks a cure or a treatment that Dr. Gore could not provide. The failure to cure an incurable medical condition does not violate the Eighth Amendment. *See Jones v. Gujral*, No. 3:16-cv-19, 2018 WL 3451460, at *5 (E.D. Va. July 17, 2018) (citation omitted). Thus, Daniels fails to demonstrate that Dr. Gore was deliberately indifferent to Daniels' complaints about his persistent loss of taste and smell.[10]

With respect to Daniels' complaints about shortness of breath with exertion, the record reflects that Daniels did not report any shortness of breath until an appointment with NP Blowe on October 15, 2021.[11] However, once Daniels complained of his shortness of breath to NP Blowe, she prescribed him with medicines to help his breathing. Dr. Gore then ordered and approved a battery of tests, including x-rays, a CT Angiogram, and outside referrals to a variety of specialists, including a pulmonologist and an ENT who provided Daniels with treatment and other recommendations. Despite several of the specialists recommending that Daniels should see an ENT, at the time of his appointment with the ENT, Daniels refused to go. Thus, the record establishes that contrary to Daniels' contentions, Dr. Gore provided a great deal of medical treatment for

---

[10] Although COVID-related loss of taste and smell is not curable, Dr. Gore did arrange for Daniels to see an ENT doctor. However, Daniels chose not to go to the recommended ENT appointment where he would have received further examination.

[11] Daniels states that, "Dr. Gore, though aware of Daniels's serious medical needs as early as August 11, 2020, chose not to take any action until over a year later on September 20, 2021 when authorizing an x-ray on Daniels." (Daniels' Aff. ¶ 9.) Daniels offers no specific facts to support this assertion. *See Roane*, 378 F.3d at 400–01.

13

Daniels' long-COVID related symptoms. Daniels fails to demonstrate that Dr. Gore was deliberately indifferent to his loss of taste and smell and shortness of breath with exertion. Accordingly, Claim One (a) lacks merit and will be dismissed.

### C. Disc Disease

In Claim One (b), Daniels contends that Dr. Gore was deliberately indifferent to Daniels' "untreated severe degenerative disc disease." (Compl. at 8.) Daniels insists that at his September 6, 2022 chronic care appointment with Dr. Gore "to assess the protrusion that had developed within [his] neck," Dr. Gore assessed Daniels as having "swollen lymph nodes." (Daniels' Aff. ¶ 13.) Daniels contends that "Dr. Gore prescribed Daniels no further medical assistance or treatment regarding the condition of Daniels's neck, though Daniels complained of persistent pain." (*Id.* ¶ 14.)

When Daniels initially presented with a knot in his neck in August 2021, Dr. Gore referred Daniels to have an ultrasound. The ultrasound showed a calcification in Daniels' neck. Because of the calcification found in Daniels' neck, Dr. Gore ordered an x-ray of Daniels' neck which revealed severe degenerative disc diseases at the C5–C6 level or his cervical spine. Dr. Gore explained that degenerative disc disease is a chronic condition that occurs as people age and is not a condition that anyone caused Daniels to develop. In April 2022, NP Blowe discussed the x-ray findings with Daniels and prescribed him two (2) medications to help with Daniels' reported pain. Dr. Gore also referred Daniels to an orthopedist, who also examined Daniels on August 24, 2022, and concluded that no treatment or medicine was needed at that time for Daniels' degenerative disc disease and that Daniels could follow up as needed.

14

Here, although Daniels seemingly disagrees with the timing and course of care he received, this fails to demonstrate deliberate indifference on the part of Dr. Gore. Daniels fails to demonstrate that Dr. Gore subjectively recognized a serious risk of harm to Daniels and chose to ignore that risk. Mere "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state [a claim of deliberate indifference] unless exceptional circumstances are alleged." *Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Daniels' main complaint with respect to his degenerative disc disease appears to be that Dr. Gore did not make him entirely pain-free. However, Daniels was prescribed medications to assist with his discomfort and was referred to an orthopedist who also recommended no further treatment was needed at that time. To the extent that Daniels specifically faults Dr. Gore for failing to take any further action at his chronic care appointment on September 6, 2022, on that day, the record reflects that Daniels reported that his cervical spine pain was 2 out of 10. Moreover, Daniels had just seen the orthopedist thirteen (13) days before and the orthopedist determined that no further treatment was needed.

"It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001). Because the reasonableness of any such response usually calls for a medical

15

judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001))). This is clearly not such an extreme circumstance that judicial interference is warranted. Instead, the record makes clear that Dr. Gore was responsive to Daniels' complaints about the knot in his neck and the degenerative disc disease in his cervical spine. Accordingly, Claim One (b) lacks merit and will be dismissed.

### D. State Law Claim

"Although a federal court has discretion to assert pendent jurisdiction over state claims even when no federal claims remain, . . . certainly[ ] if the federal claims are dismissed before trial . . . the state claims should be dismissed without prejudice." *Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Hous. Auth.*, 11 F. App'x 283, 287 (4th Cir. 2001) (citations and internal quotations omitted). Accordingly, Claim Two will be dismissed without prejudice.

### IV. CONCLUSION

The Motion for Summary Judgment (ECF No. 42) will be granted. Claim One will be dismissed with prejudice. Claim Two will be dismissed without prejudice. The action will be dismissed.

16

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: June 17, 2024
Richmond, Virginia